STATE OF NEW JERSEY, DEPARTMENT OF TRANSPOR-
TATION AND NEW JERSEY TURNPIKE AUTHORITY,
PLAINTIFFS, v. THE PORT AUTHORITY OF NEW YORK
AND NEW JERSEY, DEFENDANT.

Superior Court of New Jersey
Law Division

Decided June 7, 1977.

*Mr. Paul G. Levy,* Assistant Attorney General, for plaintiffs (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney for Department of Transportation, and *Mr. Robert N. Wilentz,* General Counsel, attorney for New Jersey Turnpike Authority).

*Mr. Francis A. Mulhern* for defendant.

OSBORNE, J. S. C. This case was originally presented to the court on a motion for summary judgment by plaintiffs,

New Jersey Department of Transportation (DOT) and New
Jersey Turnpike Authority (Turnpike). The parties there-
after agreed at the hearing to have the matter resolved on
cross-motions for summary judgment.

The complaint seeks a declaratory judgment that (1) the
Port Authority has authority to commit funds to the Route
81 project under existing bi-state legislation; (2) additional
bi-state legislative approval is not required to permit the
Authority to pay a part of the cost of said project, and (3)
existing statutory authority renders the design agreement
for the project and the resolution of the Board of Commis-
sioners of the Port Authority dated May 26, 1975, a valid
and unconditional obligation by the Authority to assume
50% of the costs of said project upon formal ratification by
the Authority of a written agreement to that effect.

The parties agree that the primary issue is whether the
Authority is authorized under existing legislation to par-
ticipate in the construction costs of the project. The his-
tory behind this lawsuit is relevant to a determination of
this question.

On May 6, 1976 plaintiffs and defendant entered into an
agreement for professional engineering services with respect
to the design of the project. Pursuant to this agreement the
parties were to share the total project cost[1] of $50 million
as follows — 50% by the Authority, 25% by the Turnpike,
and 25% by DOT.

A brief description of the project is essential. The "En-
vironmental Impact Assessment" prepared by DOT indicates
that it will consist of the construction of Turnpike Inter-
change 13A, approximately 2½ miles north of the existing
Interchange 13, and the construction of a new highway in-
terchange connecting the new Turnpike interchange with
North Avenue and Routes 1 and 9 in Elizabeth.

---

[1] The agreement also provides that the Authority will absorb all
design costs (over $1.6 million) if the construction of the project
is not commenced.

The purpose of the project as set forth in the "Environmental Impact Assessment" is to:

"significantly improve the access to Newark Airport, Ports Elizabeth and Newark, and the extensive industrial/warehouse development in the northeastern portion of Elizabeth."

All parties agree that the project would indeed provide improved access to existing authority facilities as well as benefit the New Jersey Turnpike, the State Highway system and, in particular, the City of Elizabeth.

A close reading of the design agreement indicates that none of the parties contemplated that this would be the final expression of their joint venture. Paragraph 3 supports this conclusion in stating:

WHEREAS, the State of New Jersey, the Port Authority of New York and New Jersey and the New Jersey Turnpike Authority, upon being duly authorized, contemplate entering into a comprehensive Tri-Party Agreement providing for the construction of said Interchange 13A-Route 81, Project; * * *

Throughout the agreement there are also additional references to the parties' intent to enter into other contracts for final design and construction.

The initial controversy arose upon the authority's being advised by its general counsel and bond counsel that bistate legislative authorization was required for Port Authority participation in the actual construction of the project. Pursuant to this advice a meeting of the Board of Commissioners of the Authority was held on May 26, 1976, at which the following resolution was passed:

RESOLVED, that the Executive Director be and he hereby is authorized to enter into a definitive project agreement on behalf of the Port Authority with the New Jersey Department of Transportation and the New Jersey Turnpike Authority in connection with work to be performed by each agency for the New Jersey Route 81 and New Jersey Turnpike Interchange 13A Project in the vicinity of Newark International Airport, and providing for all project costs, estimated to total $50 million, to be assumed — 50%

by the Port Authority, 25% by the New Jersey Department of Transportation and 25% by the New Jersey Turnpike Authority provided that appropriate legislative authorization for Port Authority participation shall be adopted by the states of New York and New Jersey; * * *

\* \* \* \* \* \* \* \*

Plaintiffs argue that the resolution is not a bar to Port Authority participation in the construction of the project because such participation is authorized under *N. J. S. A.* 32: 1–7, 32:1–26 and 32:1–33. Plaintiffs wish this court to construe these sections liberally because, they argue, the Legislatures intended that the Port Newark and Port Elizabeth areas be developed to benefit the surrounding communities. Plaintiffs assert, therefore, that the project is in the public interest and within the broad powers conferred upon the Port Authority.

Defendant is willing to proceed with the construction of the project if the court grants summary judgment in favor of plaintiffs.[2] Defendant, however, contends that bi-state legislative approval is required for the following reasons: (1) the project would not be part of any existing Port Authority facility nor would it be an exclusive connection to any facility; (2) the project would only incidentally benefit the marine and airport terminals since it is without the terminals proper, and existing legislation permits road construction only within the terminals proper, and (3) similar access projects such as the Route 80 access road to the George Washington Bridge and construction of the third tube of the Lincoln Tunnel were of such magnitude as to require bi-state enabling legislation. The Route 81 project, being of equal magnitude, requires bi-state legislative ap-

---

[2]This court will not deal with the issue of whether the Port Authority may actually appropriate funds for construction of Route 81 in light of the recent United States Supreme Court opinion rendered in *United States Trust Co. of New York, Trustee v. New Jersey,* —— U. S. ——, 97 S. Ct. 1505, 52 L. Ed. 2d 92, on April 27, 1977.

proval irrespective of any benefit to the public through its construction.

The court is thus faced with the task of construing the relevant statutes to determine if there is any support for plaintiffs' position. In construing a statute the initial task of the court is to seek the legislative intent, and to that end it must consider any history which may be of aid. *Lloyd v. Vermeulen*, 22 *N. J.* 200, 206 (1956); *Dept. of Health v. Sol Schnoll Dressed Poultry Co.*, 102 *N. J. Super.* 172, 176 (App. Div. 1968); *Raybestos-Manhattan, Inc., v. Glaser*, 144 *N. J. Super.* 152, 168 (Ch. Div. 1976).

In 1921 the States of New York and New Jersey entered into a compact whereby the Port Authority[3] was created. *N. J. S. A.* 32:1–4. This compact envisioned a plan for the comprehensive development of the Port Authority district. *N. J. S. A.* 32:1–11. In accordance with said plan, the Port Authority was granted power to make recommendations to the Legislatures of New York and New Jersey "for the better conduct of the commerce passing in and through the Port of New York, the increase and improvement of transportation and terminal facilities therein, and the more economical and expeditious handling of such commerce." *N. J. S. A.* 32:1–13. Clearly, the Port Authority's involvement in constructing means of transportation[4] was contemplated by the very language of *N. J. S. A.* 32:1–7, which provides, where pertinent:

---

[3]After July 1, 1972 reference to "The Port of New York Authority" is deemed to refer to "The Port Authority of New York and New Jersey." *N. J. S. A.* 32:1–4.1.

[4]The original transportation problems of the Port Authority were initially determined to be railroad problems with respect to the distribution and handling of freight and cargo, not passengers. *United States Trust Co. of New York v. State*, 134 *N. J. Super.* 124, 135 (Law Div. 1975), aff'd 69 *N. J.* 253 (1976), rev'd by United States Supreme Court, April 27, 1977.

> The port authority shall constitute a body, both corporate and politic, with full power and authority to * * * construct * * * any terminal or transportation facility within said district; * * *

After conferring this power upon the Port Authority the Legislatures defined the terms "transportation facility" and "terminal facility." *N. J. S. A.* 32:1–23 provides:

> * * * "Transportation facility" shall include railroads, steam or electric, motor truck or other street or highway vehicles, tunnels, bridges, boats, ferries, carfloats, lighters, tugs, floating elevators, barges, scows or harbor craft of any kind, aircraft suitable for harbor service, and every kind of transportation facility now in use or hereafter designed for use for the transportation or carriage of persons or property. "Terminal facility" shall include wharves, piers, slips, ferries, docks, dry docks, bulkheads, dockwalls, basins, carfloats, floatbridges, grain or other storage elevators, warehouses, cold storage, tracks, yards, sheds, switches, connections, overhead appliances, and every kind of terminal or storage facility now in use or hereafter designed for use for the handling, storage, loading or unloading of freight at steamship, railroad or freight terminals. * * * * * * * *
> "Facility" shall include all works, buildings, structures, appliances and appurtenances necessary and convenient for the proper construction, equipment, maintenance and operation of such facility or facilities or any one or more of them. * * *

■ ■ Plaintiffs contend that the Route 81 project is within the scope of a "transportation" or "terminal" facility as defined above. The court finds no support for this proposition. To hold otherwise would clearly violate the plain intent of the Legislatures. The statute is express in defining "transportation facility" as facilities "for the use for the transportation or carriage of persons or property," *i. e.*, vehicles or vessels of various kinds. The phrase "and every kind of transportation facility" deserves some consideration. Under the statutory rule of *ejusdem generis,* general terms which follow specific terms are limited to matters similar to those so specified. *General Roofing Co. v. Belmar,* 77 *N. J. Super.* 469, 472 (App. Div. 1962) ; *United States v. LaBrecque,* 419 *F. Supp.* 430, 432 (D. C. N. J. 1976). This rule is not to be used without first construing

the intent of the Legislature in drafting the statute. *New Ark Coop., Inc. v. Stalks,* 141 *N. J. Super.* 37, 38 (Law Div. 1976). The general words, "and every kind of transportation facility," must be construed as embracing only vessels or vehicles of the class delineated in the statute.

The same principles would apply to any judicial construction of the term "terminal facility." It may be inferred that "terminal facilities" are solely adjuncts of "transportation facilities" — for example, railroad stations, docks, airports, etc. The Port Authority 1962 Covenant — Bar to Mass Transportation, 27 *Rutg. L. Rev.* (1973). To expand the definition of "terminal facility" to include the proposed Route 81 project would defeat the intention of the Legislature. As aptly stated in *Harlan v. Fidelity & Casualty Co.,* 139 *N. J. Super.* 226 (Law Div. 1976):

* * * The Legislature is deemed to have intended what it said and the court may not construe a contrary concept. If such was not the Legislature's intent, it is up to that body to correct its own handiwork. [at 229]

Plaintiffs rely next upon *N. J. S. A.* 32:1–26, which sets forth the statutory principles to govern the development of the Port Authority the Third and Eighth of which read as follows:

Third—That there should be the most direct routing of all commodities, so as to avoid centers of congestion, conflicting currents and long truck hauls;
* * * * * * *
Eighth—That highways for motor truck traffic should be laid out so as to permit the most efficient interrelation between terminals, piers and industrial establishments not equipped with railroad sidings, and for the distribution of building materials and many other commodities which much [must] be handled by trucks; these highways to connect with existing or projected bridges, tunnels and ferries; * * *.

The parties were apparently mindful of the Third principle set forth above when they entered into the joint venture to design the Route 81 project, since there is no ques-

tion that the project will greatly alleviate traffic tie-ups at existing centers of congestion. There is, however, no authority under this principle for the Port Authority to engage in the actual construction of highways.

There is equally no authority "to construct" conferred upon the Authority under principle Eight, which grants power to the Port Authority to design or layout highways in accordance with the comprehensive plan referred to in the statute. Stated simply, the Port Authority may *design* but not *construct* highways without bi-state legislative approval.

Plaintiffs make final reference to *N. J. S. A.* 32:1–33, under which the Port Authority is urged to cooperate with the state highway commissioners of each state in order that trunk line highways fit in with the comprehensive plan. This section is a clear recognition that the Legislature did not intend to give to the Port Authority the authority to construct "trunk line highways" but rather that the Port Authority should cooperate with the state agency which controls the highway construction so that such construction would comply with the development of the Port Authority district.

*N. J. S. A.* 32:1–35.1, cited by both parties in oral argument, in no way supports plaintiffs' position. This section recognizes that the problem of furnishing proper and adequate air terminal facilities is a *bi-state problem*. It is in *N. J. S. A.* 32:1–35.3 that the first mention of access facilities can be found. Under this section the definition of air terminals was amended to mean:

* * * facilities providing *access* to an air terminal, consisting of rail, rapid transit or *other forms of mass transportation* which furnish a connection between the air terminal and other points in the port district, including appropriate *mass transportation terminal facilities* at and within the air terminal itself and suitable offsite facilities for the accommodation of air passengers, baggage, mail, express, freight and other users of the connecting facility. [Emphasis supplied]

Although the Port Authority is expressly authorized to undertake mass transportation access projects, *N. J. S. A.* 32:1–35.20, the statute fails to define the term "mass transportation." Under § (3), the Legislatures of both states recognize that "additional highway construction to serve these great airports is not feasible," and accordingly under § (4) "access to these airports by railroads or other forms of mass transportation must be undertaken." The court cannot look to a single sentence or part of a sentence in a statute in ascertaining its objective; rather, the court must look to the provisions of the whole law. *Ringsley v. Hawthorne Fabrics, Inc.*, 41 *N. J.* 521, 526 (1964); *Raponotti v. Burnt-Mill Arms Inc.*, 113 *N. J. Super.* 173, 178 (App. Div. 1971).

It is interesting to note that the Legislatures made reference to highways and mass transportation in separate subsections. In this context, this bifurcated. reference reveals a legislative intent that highways are not to be within the scope of mass transportation access projects. Accordingly, plaintiffs' position fails under *N. J. S. A.* 32:1–35.1.

Research has not disclosed any case in New Jersey precisely on point. The parties have cited *Port of N. Y. Authority v. Weehawken Tp.*, 14 *N. J.* 570 (1954), in support of their arguments. In that case the statute expressly prohibited the construction of any additional tunnels without bi-state approval. The court found that the contemplated third tube of the Lincoln Tunnel was of such magnitude, especially costwise (approximately $90 million), that it had to be considered an "additional tunnel" and not merely an improvement of the existing tunnel. Hence, bi-state approval was required.

In the present case, the Route 81 project, although substantially less in cost than the third tube of the Lincoln Tunnel, nevertheless is of no lesser magnitude in public importance and consequence. It is worthy to note that the Legislatures of New York and New Jersey have undertaken

additional construction projects[5] after bi-state approval was obtained.[6] Bi-state approval was doubtless sought because of the scope of the projects and the need to weigh the public interest factor. As stated by Justice Brennan in *Port of N. Y. Authority v. Weehawken Tp., supra*:

\* \* \* So all encompassing a delegation of power in a matter of such public importance and consequence should not be lightly inferred but ought plainly appear. [at 577]

And

\* \* \* We need not decide whether the Legislatures imposed the restraint in consideration of the great cost of such projects, a matter doubtless prominently in mind in 1931 at the onset of the Great Depression, or because the Legislatures recognized in that way the responsibility which is primarily theirs to weigh the several factors of public concern involved in the decision of the necessity for and practicability of a project of such magnitude \* \* \*. [at 580]

This court is required to interpret and enforce the legislative will as written and not according to some supposed unexpressed intention. *Camden v. Local Government Bd.*, 127 *N. J. L.* 175, 178 (Sup. Ct. 1941); *Petrangeli v. Barrett*, 33 *N. J. Super*. 378, 386 (App. Div. 1954). The desires and goals of the Port Authority, or for that matter of any agency, cannot run counter to the legislative mandate. *Newark v. Essex Cty. Bd. of Taxation*, 103 *N. J. Super*. 41, 60 (Law Div. 1968). To grant the relief which plaintiffs seek would be, in effect, to sanction the Port Authority building, without bi-state approval, not merely the Route 81 project but as many highways as it deems ben-

---

[5]George Washington Bridge, *N. J. S. A.* 32:1–71; Route 80, *N. J. S. A.* 32:1–119, Arthur Kill Bridge, *N. J. S. A.* 32:1–36; Bayonne Bridge, *N. J. S. A.* 32:1–94.

[6]The power to add, amend, or change any part of the comprehensive plan was reserved to the Port Authority subject to bi-state legislative approval. *N. J. S. A.* 32:1–119.

eficial to the public and in accord with the comprehensive plan. Certainly, this is not the plain intent of the Legislatures, especially where, as here, they have remained silent. Not even an inference of the delegation of power to the Port Authority to construct Route 81 is permissible under the existing legislation.

For the reasons set forth above, plaintiffs' motion for summary judgment is hereby denied; defendant's cross-motion for summary judgment is granted.